**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

SHANE MEDORE MAGGI, AKA
Shane Maggi,
            *Defendant-Appellant;*

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

GORDON RAY MANN, Jr.,
            *Defendant-Appellant.*

Nos. 08-30223
        09-30052

D.C. Nos.
4:07-cr-00125-SEH;
4:08-CR-00068-SEH

OPINION

Appeals from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
September 1, 2009—Seattle, Washington

Filed March 16, 2010

Before: Michael Daly Hawkins, M. Margaret McKeown and
Jay S. Bybee, Circuit Judges.

Opinion by Judge McKeown

**COUNSEL**

Palmer A. Hoovestal (argued), Hoovestal Law Firm, PLLC, Helena, Montana, for defendant-appellant Gordon Mann.

James B. Obie, Obie Law, P.C., Helena, Montana; Daniel Donovan (argued), Great Falls, Montana, for defendant-appellant Shane Maggi.

William W. Mercer, United States Attorney, E. Vincent Carroll (argued), Assistant U.S. Attorney, U.S. Attorney's Office, Great Falls, Montana, for government-appellees United States of America.

---

## OPINION

McKEOWN, Circuit Judge:

The Major Crimes Act, 18 U.S.C. § 1153, provides federal criminal jurisdiction for certain crimes committed by Indians in Indian country. As the Supreme Court explained in *United States v. Antelope*, "we are dealing [ ] not with matters of tribal self-regulation, but with federal regulation of criminal conduct within Indian country implicating Indian interests." 430 U.S. 641, 646 (1977). Determination of who is an Indian under the statute is not as easy as it might seem. Indeed, the statute contains no definition, leaving to the courts the task of defining "Indian." *See* FELIX COHEN, HANDBOOK OF FEDERAL INDIAN LAW § 3.03[4] (LexisNexis 2005) ("COHEN"). We have developed a framework for evaluating Indian status under § 1153: 1) the presence of some Indian blood indicating tribal ancestry; and 2) tribal or government recognition as an Indian. *United States v. Bruce*, 394 F.3d 1215, 1223 (9th Cir. 2005). Both prongs must be satisfied to establish Indian status.

Gordon Mann and Shane Maggi appeal from unrelated convictions on the same basis, namely that they are not "Indians" for purposes of prosecution under the Major Crimes Act. Because there is no evidence that Mann has any blood from a federally recognized Indian tribe, his conviction must be vacated. Maggi's documented blood from a federally recog-

nized tribe is scant—1/64. However, we do not decide the novel question whether Maggi's Indian blood degree is adequate; rather, because Maggi lacks sufficient government or tribal recognition as an Indian, his conviction must also be vacated. In light of this disposition, we need not consider Maggi's additional challenges to the sufficiency of the indictment and the reasonableness of the sentence.

## BACKGROUND

### I.   GORDON MANN

Gordon Mann was convicted in district court in Montana for one count of aggravated sexual abuse of a minor. Mann confessed to the criminal conduct, which occurred at his house, located within the boundaries of the Blackfeet reservation.

Since 1987, Mann has been an enrolled member of the Little Shell Tribe of the Chippewa Cree. This Indian tribe is not recognized by the federal government, although there is a longstanding petition for recognition pending. The tribe does not receive land, medical care, education, housing, federal grants or other benefits from the federal government that federally recognized tribes typically receive. The Little Shell Tribe is, however, recognized as an Indian tribe by the State of Montana, and has close to 5000 enrolled members who receive some limited benefits, including access to a medical clinic and an economic development program.

Tribal enrollment records often include identification of an individual's percentage of Indian blood, calculated according to ancestral connections to a tribe or tribes. This information is used to establish eligibility for enrollment. Mann's enrollment record notes that his degree of Indian blood is 10/64 Chippewa and 11/64 "other Indian blood."

Mann was charged in October 2008 with two counts of aggravated sexual abuse. Count I was charged under 18

U.S.C. §§ 1153(a), the Major Crimes Act, and 2241(c), sexual offense in a federal enclave. Count II was charged under 18 U.S.C. §§ 1152, the General Crimes Act, and 2241(c). An element of the charge under § 1153(a) was that Mann is an Indian; an element of the charge under § 1152 was that Mann is *not* an Indian.

At trial, Mann maintained that he is not an Indian for purposes of § 1153(a). At the close of the prosecution's case, Mann moved for a judgment of acquittal on the ground that the government had not established his Indian status. The court denied the motion on the basis that Indian status is a jury determination. Mann renewed the motion following the close of evidence, and it was again denied. Using a bifurcated verdict form, the jury concluded Mann was an Indian, and found him guilty on Count I, under § 1153. The jury did not reach Count II, under § 1152.

## II. SHANE MAGGI

Shane Maggi was convicted in district court in Montana on four counts relating to assault with a dangerous weapon and related firearms charges. Maggi attacked Kelly Hoyt and his wife, Kimberly Hoyt, in their home, which is within the boundaries of the Blackfeet Indian reservation.

Maggi's degree of Indian blood is 1/64 from the Blackfeet tribe and 1/32 from the Cree tribe, although the record does not show whether he is descended from a federally recognized tribe (e.g., Rocky Boy Reservation Chippewa Cree) or a non-recognized tribe (e.g., Little Shell Tribe Chippewa Cree). Maggi is not an enrolled member of any Indian tribe. His mother is an enrolled member of the Blackfeet tribe, which qualifies Maggi as a "descendant member" of the Blackfeet tribe and eligible for certain benefits, such as limited treatment from Indian Health Services (IHS), hunting and fishing rights on the reservation, and access to certain college grants. Maggi has received treatment at an IHS hospital facility in

Montana. Maggi has also been prosecuted in several unrelated prior actions in the Blackfeet tribal court, which has jurisdiction to prosecute enrolled and descendant members of the Blackfeet tribe. According to testimony by the Hoyts, Maggi held himself out as an Indian and discussed attending pow-wows and participating in sweats and smudging, which are tribal religious practices.

Maggi was charged with four counts: (I) under 18 U.S.C. §§ 113(a)(3) and 1153, assault with a dangerous weapon of Kelly Hoyt; (II) the same, as to Kimberly Hoyt; (III) under 18 U.S.C. § 924(c)(1)(A)(iii), discharging a firearm during a crime of violence, as alleged in Count I; and (IV) under 18 U.S.C. § 924(c)(1)(A)(ii), brandishing a firearm during a crime of violence, as alleged in Count II.

Maggi entered a plea of not guilty and proceeded to trial. At the close of the prosecution's case, Maggi moved for a judgment of acquittal on the basis that he is not an Indian, as required under § 1153. As in Mann's case, the court denied the motion on the basis that Indian status must be determined by the jury. Maggi did not present a case, and so the record was closed following the decision on the motion to acquit. The jury convicted Maggi on all four counts. On appeal, Maggi does not challenge that he perpetrated the underlying criminal conduct. Maggi instead contends that he is not an Indian for purposes of prosecution under § 1153.

## ANALYSIS

### I. INDIAN STATUS UNDER § 1153

[1] The Major Crimes Act, 18 U.S.C. § 1153, establishes federal criminal jurisdiction over certain serious crimes committed in Indian country by Indian defendants. The General Crimes Act, 18 U.S.C. § 1152, provides federal criminal jurisdiction over certain crimes committed in Indian country when either the defendant or the victim, but not both, are Indian.

Section 1152 is not directly at issue in these appeals, but is referenced because of the interrelationship between the statutes and the fact that the definition of Indian status is relevant to both provisions. The *Bruce* case provides a thoughtful discussion of federal jurisdiction in Indian country, with a focus on Indian status under these two statutes. 394 F.3d at 1218-22.

**[2]** Section 1153(a) reads:

> Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

Under § 1153(a), the defendant's status as an Indian is an element of the offense that must be alleged in the indictment and proved beyond a reasonable doubt. *United States v. Cruz*, 554 F.3d 840, 845 (9th Cir. 2009) (quoting *Bruce*, 394 F.3d at 1229).

**[3]** Because there is no statutory definition of who is an Indian, courts have stepped in to spell out the meaning of "Indian" for purposes of criminal jurisdiction. Reaching back to the mid-nineteenth century, in *United States v. Rogers*, the Supreme Court announced that to be considered an Indian for purposes of criminal jurisdiction, an individual must have an ancestral connection to an Indian tribe in addition to a current

social affiliation with the tribe. 45 U.S. (4 How.) 567, 573 (1846). Based on *Rogers*, the two-part test developed and took root. *See* COHEN, *supra*, § 3.03[4] ("The common test that has evolved after *United States v. Rogers*, for use with both of the federal Indian country criminal statutes, considers Indian descent, as well as recognition as an Indian by a federally recognized tribe."). *Bruce* articulates this test as follows:

> The term "Indian" is not statutorily defined, but courts have "judicially explicated" its meaning. [*United States v.*] *Broncheau* [597 F.2d 1260, 1263 (9th Cir. 1979), *cert. denied*, 444 U.S. 859 (1979)]. The generally accepted test for Indian status considers " '(1) the degree of Indian blood; and (2) tribal or government recognition as an Indian.' " *United States v. Keys*, 103 F.3d 758, 761 (9th Cir. 1996) (quoting *Broncheau*, 597 F.2d at 1263); *see also United States v. Rogers*, 45 U.S. (4 How.) 567, 573 (1846) (interpreting the meaning of "Indian" under the Trade and Intercourse Act of 1834, the precursor of the Major Crimes Act, not to apply to a white man who had been adopted into the Cherokee tribe). A person claiming Indian status must satisfy both prongs.

394 F.3d at 1223. Although *Bruce* arose in the context of § 1152, four years later we confirmed that the same test applies under § 1153. *Cruz*, 554 F.3d at 845.

**[4]** There is an important overlay to the *Bruce* test: To be considered an Indian under §§ 1152 or 1153, the individual must have a sufficient connection to an Indian tribe that is *recognized by the federal government*. Affiliation with a tribe that does not have federal recognition does not suffice. We directly addressed this issue in *LaPier v. McCormick*, 986 F.2d 303 (9th Cir. 1993). LaPier challenged his Montana state court conviction, maintaining that he should have been tried in federal court under § 1153 because he was an Indian. *Id.*

LaPier was an enrolled member of the Little Shell Tribe of Chippewa, the same tribe in which Mann is enrolled. *Id.* at 306. We concluded that our analysis of LaPier's Indian status could be appropriately truncated because he was not affiliated with a federally recognized tribe:

> We need not address, however, the question whether LaPier has shown a significant degree of blood and sufficient connection to his tribe to be regarded as one of its members for criminal jurisdiction purposes. *See, e.g.*, *United States v. Rogers*, 45 U.S. (4 How.) 567, 573 (1846); *United States v. Broncheau*, 597 F.2d 1260, 1263 (9th Cir. 1979), *cert. denied*, 444 U.S. 859 (1979). There is a simpler threshold question that must be answered first, and in this case it is dispositive: Is the Indian group with which LaPier claims affiliation a federally acknowledged Indian tribe?

> If the answer is no, the inquiry ends. A defendant whose only claim of membership or affiliation is with an Indian group that is not a federally acknowledged Indian tribe cannot be an Indian for criminal jurisdiction purposes. *Cf. United States v. Heath*, 509 F.2d 16, 19 (9th Cir. 1974) (member of "terminated" Indian tribe no longer an Indian for criminal jurisdiction purposes).

*Id.* at 304-05.

*LaPier*'s requirement reflects the purpose of requiring proof of Indian status under § 1153, namely not to identify individuals as Indian solely in a racial or anthropological sense, but to identify individuals who share a special relationship with the federal government. *See LaPier*, 986 F.2d at 305 ("Federal legislation treating Indians distinctively is rooted in 'the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of

treaties and the assumption of a "guardian-ward" status, to legislate on behalf of federally recognized Indian tribes.' " (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974))).

The Supreme Court explained the connection between this special federal relationship and the exercise of federal criminal jurisdiction in *United States v. Antelope*. The Court dispelled the notion that racial classification drives the Indian status identification under § 1153:

> [I]n the present case we are dealing, not with matters of tribal self-regulation, but with federal regulation of criminal conduct within Indian country implicating Indian interests. But the principles reaffirmed in [*Morton v.*] *Mancari* and *Fisher* [*v. District Court*] point more broadly to the conclusion that federal regulation of Indian affairs is not based upon impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as "a separate people" with their own political institutions. Federal regulation of Indian tribes, therefore, is governance of once-sovereign political communities; it is not to be viewed as legislation of a " 'racial' group consisting of 'Indians' . . . ." *Morton v. Mancari*, *supra*, at 553 n. 24.

430 U.S. at 646. We recently echoed the sentiments in *Antelope* to spell out how criminal jurisdiction over Indians does not cover all Indians in an ethnic sense. In interpreting the 1990 Amendments to the Indian Civil Rights Act, which clarified that Indian tribes have the inherent power to exercise jurisdiction over all Indians, we explained: "Taken together, the 1990 Amendments, the Major Crimes Act, and *Antelope* mean that the criminal jurisdiction of tribes over 'all Indians' recognized by the 1990 Amendments means all of Indian ancestry who are also Indian by political affiliation, not all who are racially Indians." *Means v. Navajo Nation*, 432 F.3d 924, 930 (9th Cir. 2005).

At Mann's trial, the government argued that *LaPier* has been superseded by the test for Indian status captured in *Bruce*. The district court in turn questioned the "continuing vitality of the *LaPier* case," and noted that "the *Bruce* case, while not directly overruling *LaPier*, eviscerates any declarations that appear in the *LaPier* decision that are contrary to the detailed analysis of the entire issue by the court in the *Bruce* opinion."

Although we do not view the cases as being in conflict, we want to put to rest any potential confusion or any suggestion that *LaPier* has passed out of the equation for Indian status. *LaPier*'s holding that Indian status requires affiliation with a federally recognized tribe remains good law and is complemented by the *Bruce* test, which presupposes that "tribal or government recognition as an Indian" means as an Indian from a federally recognized tribe[1].

## II.    Application of the *United States v. Bruce* Test

Mann and Maggi both contend that the district court erred by denying their motions to acquit because the element of Indian status was not established. "Where a defendant moves for acquittal at the close of the government's evidence, we review de novo whether sufficient evidence exists to support a guilty verdict." *United States v. Stewart*, 420 F.3d 1007, 1014 (9th Cir. 2005). In applying the deferential sufficiency of the evidence standard, we determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

---

[1]*LaPier*'s requirement of affiliation with a recognized tribe is considered hornbook law: "For many federal jurisdictional and statutory purposes it is not enough that the individual be regarded as an Indian by his or her community; the person must be considered a member of a *federally recognized* tribe. *LaPier*, 986 F.2d at 305; *State v. Sebastian*, 243 Conn. 115 (1997); *United States v. Antoine*, 318 F.3d 919 (9th Cir. 2003)." William C. Canby, Jr., American Indian Law in a Nutshell 10 (5th ed. 2009) ("Canby 5th Ed.") (emphasis in original).

elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also Cruz*, 554 F.3d at 843-44 (holding that sufficiency of evidence standard applies when reviewing the denial of a motion for acquittal challenging jurisdictional element of Indian status, as "we owe deference to the jury's ultimate factual finding").[2]

## A. Degree of Indian Blood

The first prong of the *Bruce* test considers "the degree of Indian blood." 394 F.3d at 1223. Although the "blood" terminology may sound anachronistic, this long-standing requirement retains a current purpose. The blood element excludes individuals, like the defendant in *Rogers*, who may have developed social and practical connections to an Indian tribe, but cannot claim any ancestral connection to a formerly-sovereign community. *Bruce* explains that the blood degree prong requires ancestry living in America before the arrival of the Europeans, and notes that the fact "is obviously rarely provable as such . . . . [Therefore] [b]ecause the general requirement is only of 'some blood,' evidence of a parent, grandparent, or great-grandparent who is clearly identified as an Indian is generally sufficient to satisfy this prong." 394 F.3d at 1222 (citing William C. Canby, Jr., American Indian Law in a Nutshell 9 (4th ed. 2004)).

As discussed earlier, implicit in this discussion of Indian blood is that the bloodline be derived from a federally recognized tribe. *See Antelope*, 430 U.S. at 646; *LaPier*, 986 F.2d at 305. Although commentators have suggested that a low quantum of Indian blood may be sufficient under the statute,

---

[2]The government argues that plain error review should apply to Maggi's motion for judgment of acquittal because, although Maggi moved for judgment of acquittal at the close of the government's case, he did not renew the motion after it was denied. Because Maggi did not put on a case at trial, and thus all the evidence was entered when Maggi submitted his motion to acquit, it was unnecessary to renew the motion to preserve de novo review. *See Stewart*, 420 F.3d at 1014.

we have not had occasion to test just how "low" is too low. *See* COHEN, *supra*, § 3.03[4] ("There is no specific percentage of Indian ancestry required to satisfy the descent prong of this test."); CANBY 5TH ED., *supra*, at 9 ("Because the general requirement is only of 'some blood,' a person may be classified as an Indian despite a very low quantum of Indian blood, such as one-sixteenth."). The lowest quantum we have countenanced is 1/8 Indian blood. *See Bruce*, 394 F.3d at 1223 (citing with approval *Sully v. United States*, 195 F. 113 (D.S.D. 1912)).

**[5]** Mann has no blood from a federally recognized tribe. He has a blood degree of 10/64 Chippewa, which represents the blood related to his membership in the Little Shell Tribe of the Chippewa Cree, a non-recognized tribe. He also has 11/64 "other" Indian blood; no tribe is identified for that blood. Given the absence of evidence of any blood from a federally recognized tribe, Mann cannot meet the first prong of *Bruce*, and his conviction must be vacated.

**[6]** Maggi has a very small percentage of Indian blood from a federally recognized tribe—1/64 Blackfeet blood. In other words, Maggi has just one full-blooded Blackfeet ancestor in seven generations or, put another way, 1/64 Blackfeet blood corresponds to one great-great-great-great-great grandparent who was full-blooded Blackfeet, and sixty three great-great-great-great-great grandparents who had no Blackfeet blood. Maggi argues that this amount is so small as to render him not an Indian under the statute. We need not resolve, however, the question whether there is a baseline quantum of Indian blood required because Maggi does not meet *Bruce*'s second prong of tribal or government recognition.

## B.　TRIBAL OR GOVERNMENT RECOGNITION AS AN INDIAN

**[7]** The second prong of the Indian status test requires "tribal or government recognition as an Indian." *Bruce*, 394 F.3d at 1223. This prong "require[s] membership or affiliation

with a federally recognized tribe." *See* COHEN, *supra*, § 9.02[1][d] (citing *LaPier*, among other cases). Converse to the blood degree prong, this requirement filters out individuals who may have an Indian ancestral connection, but do not possess sufficient current social and practical connections to a federally recognized tribe. *Bruce*, 394 F.3d at 1224 (noting the "tribal or government recognition" prong of the status test is designed to " 'probe[ ] whether the Native American has a sufficient non-racial link to a formerly sovereign people.' " (quoting *St. Cloud v. United States*, 702 F.Supp. 1456, 1461 (D.S.D. 1988))).

*Bruce* enumerates factors courts have frequently employed to assess tribal or federal government recognition as an Indian:

> When analyzing this prong, courts have considered, in declining order of importance, evidence of the following: "1) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life." *United States v. Lawrence*, 51 F.3d 150, 152 (8th Cir. 1995) (citing *St. Cloud*, 702 F. Supp. at 1461).

394 F.3d at 1224; *see also Cruz*, 554 F.3d at 846, 849 n.13 (affirming that declining factor analysis described in *Bruce* is the correct approach for assessing tribal or government recognition). We note that these four factors, while broad, should not be deemed exclusive.

*Bruce* and *Cruz* provide helpful benchmarks in our assessment of Indian status. Violet Bruce was charged under § 1152 with simple assault on an Indian child. She presented the affirmative defense that she was an Indian, and therefore could not be prosecuted under § 1152, because the victim was

also an Indian. *Bruce*, 394 F.3d at 1226.**³** Bruce had 1/8 Chippewa blood, but was not enrolled in a tribe. We concluded it was error for the district court to rest its Indian status determination on lack of enrollment in a tribe. *Id.* at 1224-25. Instead, coupled with the blood degree evidence, the following facts regarding recognition were sufficient to meet Bruce's burden of production for the affirmative defense:

> Bruce produced evidence that she had participated in sacred tribal rituals, including at least one sweat lodge ritual; that she was born on an Indian Reservation and continues to reside on one; that two of her children are enrolled members of an Indian tribe; and that she has been treated by Poplar Indian Health Services and the Spotted Bull Treatment Center. More significantly, her mother testified that whenever she was arrested it "had to have been [by] a tribal person" and that she has been arrested by tribal authorities "all her life."

*Id.* at 1226.

We held the Indian status question should have gone to the jury. *Bruce* supplies the relevant framework for determining whether a defendant is an Indian under §§ 1152 and 1153. However, as far as the *quantum of evidence* required, *Bruce* is distinguishable here. In *Bruce*, we determined that the defendant had met her burden of production under § 1153. Here, however, the question is whether the government has met its burden of persuasion under § 1152—the same question we confronted in *Cruz.*

---

**³**In contrast to § 1153(a), for prosecution under § 1152, the General Crimes Act, a defendant must *not* be an Indian if the victim is an Indian. While under § 1153(a) Indian status is an element of the crime that must be proved beyond a reasonable doubt, under § 1152 Indian status is treated as an affirmative defense for which the defendant has the burden of production.

In *Cruz*, we concluded that the defendant did *not* meet the tribal or government recognition requirement for Indian status under § 1153. Christopher Cruz was a descendant member of the Blackfeet tribe, but not an enrolled member. *Cruz*, 554 F.3d at 846. Although eligible for certain limited benefits due to his status as a descendant member, there was no evidence Cruz received any services reserved only for Indians or took advantage of any benefits associated with tribal affiliation *Id.* at 847-48. Nothing suggested that Cruz participated in any way in tribal cultural life. *Id.* at 848. The only evidence in favor of recognition was, under the final *Bruce* factor, that Cruz lived on the Blackfeet reservation for a few years as a child. *Id.* We concluded that "Cruz satisfies at best only a small part of the least important factor of the four *Bruce* factors," and that the district court's failure to grant his motion to acquit was error. *Id.* at 848, 851.

The government claims Maggi has tribal or government recognition as an Indian as a result of his affiliation with the Blackfeet tribe. Maggi is not an enrolled member of the Blackfeet tribe and is ineligible to be a member. He is a descendant member of the tribe through his mother, though even she (with 1/32 Blackfeet blood) would not qualify for membership under the tribe's present requirement. While descendant status does not carry similar weight to enrollment, and should not be considered determinative, *Cruz*, 554 F.3d at 847, it reflects some degree of recognition.

The posture of *Cruz* was analogous to this case. Taking the evidence in the light most favorable to the government, we concluded that Cruz did not satisfy any of the *Bruce* factors. *Cruz* cataloged seven points relating to Indian status, which we repeat here in detail for purposes of comparison:

1. Cruz, like Maggi, "is not an enrolled member of the blackfeet Tribe of Indians or any other tribe." *Cruz*, 554 F.3d at 846.

2. Cruz, like Maggi, has " 'descendant' status in the Blackfeet Tribe as the son of an enrolled member (his mother), which entitles him to use IHS, to receive some educational grants, and to fish and hunt on the reservation." *Id.*

3. Cruz never took advantage of any of the descendant benefits. *Id.* There is only one documented instance of Maggi using IHS services. There is no evidence of Maggi taking advantage of any other benefits.

4. Cruz lived on the Blackfeet Reservation as a child and rented a room on the reservation shortly before the offense. *Id*. No evidence was produced that Maggi ever resided on the Blackfeet Reservation.

5. Cruz "was subject to the criminal jurisdiction of the tribal court and was at one time prosecuted in tribal court." *Id*. Maggi was prosecuted in tribal court several times.

6. Cruz attended public school on the reservation and worked for the Bureau of Indian Affairs. *Id*. No such evidence was produced as to Maggi.

7. Cruz never participated in Indian ceremonies or dance festivals, never voted in a tribal election, and did not have a tribal identification card. *Id*. According to one witness, Maggi talked about going to sweats. Another witness stated Maggi mentioned going to other tribal ceremonies, but admitted that she had no personal knowledge of his attendance. Those witnesses also testified that Maggi held himself out as an Indian. Like Cruz, there was no evidence that Maggi voted in a tribal election or had a tribal identification card.

We have little guidance as to the quantum of evidence necessary to sustain Indian status jurisdiction. Sorting through the handful of circuit cases addressing the issue simply underscores the need for case-by-case analysis and the necessity of invoking the *Jackson v. Virginia* standard, as we do in other

criminal cases. 443 U.S. at 319. The facts here are remarkably close to *Cruz*, in which we held that the government did not sustain its burden at trial. We reach the same conclusion here.

**[8]** When the record is boiled down, the evidence produced by the government to show tribal or government recognition of Maggi as an Indian consists of (a) status as a descendant member of the Blackfeet Tribe; (b) one instance of accessing Indian Health Services; (c) prosecutions in tribal court, without evidence regarding the result of those prosecutions or whether jurisdiction based on Indian status was determined by the court; and (d) testimony based on second-hand knowledge that Maggi participated in some tribal ceremonies. This sparse collection does not provide sufficient evidence of any of the factors set out in *Bruce*. In sum, the government did not establish facts sufficient to demonstrate tribal or government recognition of Maggi as an Indian. The district court erred in denying Maggi's motion to acquit.

## CONCLUSION

The denial of Mann's motion for acquittal is REVERSED, and his conviction under 18 U.S.C. § 1153 should be vacated. The denial of Maggi's motion for acquittal is REVERSED, and his conviction under 18 U.S.C. § 1153 should be vacated.