WATFORD, Circuit Judge,
dissenting:
I part company with the majority on a single issue, but that issue is a game-changer in this case. We all agree that federal courts have subject matter jurisdiction under 18 U.S.C. § 1153 only if the defendant is an “Indian,” which means the defendant must have both a blood connection and sufficient non-racial ties to an Indian tribe that has been recognized by the federal government. Federal recognition of an Indian tribe is a formal political act that “permanently establishes a government-to-government relationship between the United States and the recognized tribe as a ‘domestic dependent nation,’ and imposes on the government a fiduciary trust relationship to the tribe and its members.” H.R. Rep. 103-781, at 2 (1994) (footnote omitted). The majority holds that the existence of this government-to-government relationship is a factual determination for the jury to make. I would hold that it is a question of law for the court to resolve.
I
We have addressed this same judge-or-jury issue in a variety of contexts, one of which is particularly analogous here. A jurisdictional element of various federal crimes requires proof that the offense was committed within “Indian country.” See, e.g., 18 U.S.C. §§ 1152, 1153; see also 18 U.S.C. § 1151 (defining “Indian country”). We have held that this element has both a factual and a legal component: The jury decides as a factual matter where the crime occurred; the court decides as a matter of law whether that location is within Indian country. United States v. Sohappy, 770 F.2d 816, 822 & n. 6 (9th Cir.1985); United States v. Gipe, 672 F.2d 777, 779 (9th Cir.1982) (per curiam). The Second, Eighth, and Tenth Circuits have adopted the same rule. See United States v. Roberts, 185 F.3d 1125, 1138-39 (10th Cir.1999); United States v. Cook, 922 F.2d 1026, 1031 (2d Cir.1991); United States v. Deon, 656 F.2d 354, 356-57 (8th Cir.1981). Thus, at trial, the court decides the “jurisdictional status” of the place where the alleged crime occurred, “and then leaves to the jury the factual determination of whether the alleged crime occurred at the site.” Roberts, 185 F.3d at 1139; see also Felix S. Cohen, Handbook of Federal Indian Law § 9.02[1][b], p. 732 (2005 ed.) (hereafter Cohen).
The same rule applies to statutes requiring proof that the offense was committed within the “special maritime and territorial jurisdiction of the United States.” See, e.g., 18 U.S.C. §§ 113, 1111; see also 18 U.S.C. § 7 (defining the phrase). In that context, too, the jury decides as a factual matter where the crime occurred, but the court determines as a matter of law whether that location is within the special mari *1067 time and territorial jurisdiction of the United States. See United States v. Warren, 984 F.2d 325, 327 (9th Cir.1993); accord United States v. Hemandez-Fundora, 58 F.3d 802, 809-12 (2d Cir.1995); United States v. Jones, 480 F.2d 1135, 1138-39 (2d Cir.1973).
Like the Indian country and territorial jurisdiction elements at issue in these cases, the Indian status element of § 1153 has both a factual and a legal component. The factual component, to be decided by the jury, is derived from the two-prong test we established in United States v. Bruce, 394 F.3d 1215 (9th Cir.2005), which requires proof that the defendant has (1) a blood connection to an Indian tribe, and (2) sufficient non-racial ties to an Indian tribe. Id. at 1223-24. The legal component, to be resolved by the court, is whether the Indian tribe at issue has been recognized by the federal government.
Federal recognition should be classified as a legal issue because it stands doctrinally on the same footing as the determination that a particular location is within Indian country or the special maritime and territorial jurisdiction of the United States. Both determinations relate to a fixed legal status that does not change from case to case—the status of a particular location relative to the federal government in one instance, the status of the defendant’s tribe relative to the federal government in the other. And both determinations play the same role in their respective spheres: They vest federal courts with subject matter jurisdiction. Federal recognition of an Indian tribe establishes a “special relationship” between the federal government and the tribe, which “subject[s] the individual Indians affiliated with that tribe to exclusive federal jurisdiction for crimes committed in Indian country.” LaPier v. McCormick, 986 F.2d 303, 305 (9th Cir.1993). Absent that special relationship between the federal government and the defendant’s tribe, federal courts lack subject matter jurisdiction under § 1153. Id.; United States v. Heath, 509 F.2d 16, 19 (9th Cir.1974). Thus, just as the federal government must exercise jurisdiction over the place where the crime occurred for subject matter jurisdiction to vest under certain statutes, so too the federal government must recognize the defendant’s Indian tribe before subject matter jurisdiction can vest under § 1153.
The majority offers no principled basis for holding that the jurisdictional status of the defendant’s Indian tribe is a factual issue in § 1153 cases, when the jurisdictional status of a location is a legal issue in the Indian country and territorial jurisdiction cases. The two determinations seem functionally identical to me. I would apply the same rule to both and hold that the jurisdictional status of the defendant’s tribe should be determined by the court rather than the jury.
II
Beyond the doctrinal parallels, an overriding practical consideration supports treating the jurisdictional status of a location and the jurisdictional status of the defendant’s Indian tribe as questions of law: Historically, both determinations have involved review of source materials that judges are better suited than juries to evaluate. See Miller v. Fenton, 474 U.S. 104, 114, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985) (“[T]he fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.”).
Take the Indian country determination as an example. Determining whether a particular location is within Indian country typically involves construing the effect of treaties, statutes, and executive orders *1068 with respect to the geographic area at issue. See, e.g., United States v. John, 437 U.S. 634, 638-54, 98 S.Ct. 2541, 57 L.Ed.2d 489 (1978) (interpreting treaties and congressional enactments to determine whether lands designated as a reservation for the Choctaw Indians were within Indian country); United States v. Soldana, 246 U.S. 530, 531-33, 38 S.Ct. 357, 62 L.Ed. 870 (1918) (construing federal statutes to determine whether a railroad right-of-way remained within the Crow Indian Reservation); Donnelly v. United States, 228 U.S. 243, 259-69, 33 S.Ct. 449, 57 L.Ed. 820 (1913) (surveying a wide range of executive orders and legislative enactments to determine whether the bed of the Klamath River was within the Hoopa Valley Reservation). We have rightly deemed judges rather than juries better suited to the task of interpreting the meaning and effect of treaties, statutes, and executive orders. See Sohappy, 770 F.2d at 822 n. 6 (“The issue of what constitutes Indian country is properly a matter for the judge and not the jury.”). That allocation of responsibility is consistent with the Supreme Court’s general observation that “ft]he construction of written instruments is one of those things that judges often do and are likely to do better than jurors unburdened by training in exegesis.” Markman v. Westview Instruments, Inc., 517 U.S. 370, 388, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).
For most of our Nation’s history, determining a tribe’s federally recognized status also involved interpretation of treaties, statutes, and executive orders. From the founding until 1871, the federal government recognized Indian tribes primarily by negotiating treaties with individual tribes. United States v. Lara, 541 U.S. 193, 201, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004); Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 57 (2d Cir.1994); Cohen § 3.02[4], p. 140. After Congress banned treaty making with tribes in 1871, see 25 U.S.C. § 71, the Executive Branch continued to recognize tribes by negotiating bilateral agreements that Congress then ratified by statute. Antoine v. Washington, 420 U.S. 194, 203-04, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); Cohen § 5.01[3], p. 395. Since passage of the Indian Reorganization Act of 1934, 25 U.S.C. § 461 et seq., tribes have been recognized primarily through administrative action by the Bureau of Indian Affairs (BIA), initially on an ad hoc basis and then, beginning in 1978, through formal administrative procedures. See Golden Hill Paugussett Tribe, 39 F.3d at 57; 25 C.F.R. pt. 83. “Consequently, federal courts historically played a significant role in determining federally recognized tribal existence, relying heavily on the history of dealings by the political branches through treaties, statutes, executive orders, or agreements recognizing the tribe in question.” Cohen § 3,02[1], p. 136.
The fact that the source materials for resolving the issue of federal recognition have until recently been legal texts explains why there is no historical support for submitting that issue to the jury. Indeed, the majority fails to cite a single instance in which a jury has been asked to decide whether the federal government has recognized an Indian tribe. As will be shown below, our cases have instead treated the issue (at least implicitly) as one of law for the court to resolve.
The majority notes that today the task of determining which tribes have been federally recognized is much simpler because the BIA periodically publishes a list of such tribes. See 25 C.F.R. § 83.5(a) (list to be updated and published every three years). But the existence of this list, which first appeared in 1979, see LaPier, 986 F.2d at 305, cannot transform what had been a legal issue for the court into a factual question for the jury. The list merely reflects actions Congress and the *1069 Executive Branch have previously taken to confer federal recognition on the listed tribes. If tomorrow the Executive Branch created a list of all locations that are within “Indian country,” or within the “special maritime and territorial jurisdiction of the United States,” would we hold that the jurisdictional status of the place where the crime occurred is now a factual question that must be submitted to the jury? I cannot see any reason why we would.
In any event, consulting the BIA’s list will not always end the federal recognition inquiry. See Cohen § 3.02[5], p. 143 (“Tribes not included on the list may be able to establish their status as federally recognized through other means, however.”). Congress retains the authority to recognize new tribes by statute and to restore the status of previously terminated tribes without any action by the BIA, a power it has exercised a number of times since 1979. See, e.g., 25 U.S.C. §§ 566, 712a, 1300j, 1300b—11; see also Cohen § 3.02[5], p. 144 & n.57; id. § 3.02[8][c], p. 168 & n.225. In addition, Congress has declared that it alone has the authority to terminate a tribe’s federally recognized status. See Federally Recognized Indian Tribe List Act of 1994, Pub.L. No. 103-454, § 103(4), 108 Stat. 4791, 4791 (1994); Cohen § 3.02[8][a], p. 164. That means the, BIA’s failure to include a recognized tribe on the list, whether deliberately or through oversight, would not strip a tribe of its federally recognized status unless Congress had spoken through express legislative action. See Cohen § 3.02[8][a], p. 164 & n.196. Even today, then, circumstances remain in which determining a tribe’s federally recognized status might entail interpreting the meaning and effect of congressional enactments. As noted, that is not a task we typically assign to juries.
Ill
The cases on which the majority relies provide no support for its holding. We did not address whether judge or jury should resolve the issue of federal recognition in United States v. Maggi, 598 F.3d 1073 (9th Cir.2010), United States v. Cruz, 554 F.3d 840 (9th Cir.2009), United States v. Bruce, 394 F.3d 1215 (9th Cir.2005), LaPier v. McCormick, 986 F.2d 303 (9th Cir.1993), or United States v. Heath, 509 F.2d 16 (9th Cir.1974). Those cases merely established that a defendant’s Indian status is an element of the offense that must be proved to the jury beyond a reasonable doubt. See, e.g., Maggi 598 F.3d at 1077; Cruz, 554 F.3d at 845; Bruce, 394 F.3d at 1229. No one disputes that here. The only question is whether one component of that element—the federally recognized status of the tribe at issue—must be decided by the jury. On that score, the Indian country and territorial jurisdiction cases discussed above are indistinguishable. There, too, the juiy must find beyond a reasonable doubt that the offense occurred within Indian country, or within the special maritime and territorial jurisdiction of the United States. Nonetheless, we have held that one component of that element—the jurisdictional status of the place where the crime occurred—is a legal question for the court to resolve. See Warren, 984 F.2d at 327; Sohappy, 770 F.2d at 822 & n. 6; Gipe, 672 F.2d at 779.
The majority is mistaken in suggesting that Gipe supports its holding. Gipe reaffirms the rule from the territorial jurisdiction cases on which I rely: “[W]here the exercise of federal jurisdiction over a specific geographic area is necessary to vest jurisdiction in federal court,” “the court may determine as a matter of law the existence of federal jurisdiction over the geographic area, but the locus of the offense within that area is an issue for the *1070 trier of fact.” 672 F.2d at 779 (emphasis added). That rule applies here because federal recognition of the defendant’s Indian tribe is necessary to vest jurisdiction in federal court under 18 U.S.C. § 1153. See La Pier, 986 F.2d at 305; Heath, 509 F.2d at 19. The rule the majority quotes from Gipe as supportive of its holding—“where the ‘locus of the act ... constitutes an element of the crime ... the prosecution should bear the burden of proof as to the status of the site’ beyond a reasonable doubt”—does not apply to § 1153. Maj. Op. at 1062. It applies only when the status of the site is an element of the offense but is not jurisdictional, as is true under 18 U.S.C. § 1156, the statute at issue in Gipe. See 672 F.2d at 779; cf. Maj. Op. at 1056 (acknowledging that Indian status is a jurisdictional element under S 1153).
In the cases cited by the majority in which a tribe’s federally recognized status was actually at issue, we never suggested that federal recognition was a factual question. In Heath, we reversed the defendant’s conviction under 18 U.S.C. § 1153 because she was a member of a tribe whose federally recognized status had been terminated by Congress. Heath, 509 F.2d at 19. That issue had not been addressed below because Heath had stipulated at trial that she was an Indian. Id. at 17-18. But federal recognition turned on construction of a statute, the Klamath Termination Act, 25 U.S.C. § 564 et seq., and we resolved the issue ourselves. We did not treat the tribe’s status as a factual question to be decided by the district court in the first instance, or by the jury at a new trial.
In LaPier, we rejected a state habeas petitioner’s contention that, because he was an Indian, the state courts lacked jurisdiction over his offense. We rejected that contention because the petitioner’s tribe was not federally recognized. LaPier, 986 F.2d at 305-06. Although the district court had not addressed the issue, we decided it ourselves by consulting the list of federally recognized tribes prepared by the BIA. See id. We held that, “[ajbsent evidence of its incompleteness, the BIA list appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdictional inquiry.” Id. at 305. Had we regarded a tribe’s federally recognized status as a factual issue, we presumably would have remanded for resolution of that issue in the first instance by the district court.
Finally, in Maggi we reversed a defendant’s conviction under 18 U.S.C. § 1153 because the defendant’s tribe had not been recognized by the federal government. Our discussion of that issue gave no hint that we regarded federal recognition as a factual question. Contrary to the majority’s suggestion (Maj. Op. at 1060 n. 11), we did not speak of the “evidence” of federal recognition having been insufficient. Instead, we simply declared that the tribe at issue “is not recognized by the federal government, although there is a longstanding petition for recognition pending.” Maggi 598 F.3d at 1076. That declaration is as consistent with this court having resolved the issue as a matter of law as anything else.
The majority also relies on United States v. James, 987 F.2d 648 (9th Cir.1993), where we reversed a defendant’s bank robbery conviction because the government failed to introduce any evidence establishing that the bank’s deposits were insured by the Federal Deposit Insurance Corporation (FDIC). That decision seems readily distinguishable to me, since proof of FDIC insurance generally turns on review of historical facts, a responsibility juries have traditionally been assigned. See, e.g., United States v. Washburn, 758 *1071 F.2d 1339, 1339-40 (9th Cir.1985) (per cu-riam) (FDIC insurance proved by copy of bank’s original 1976 FDIC certificate and testimony that bank personnel regularly checked to make sure the certificate was still current); United States v. Ballard, 418 F.2d 325, 327 (9th Cir.1969) (FDIC insurance proved by invoice from the FDIC and cancelled check from the bank). But even if Jamss is in tension with the Indian country and territorial jurisdiction cases discussed above, those cases involve a far more analogous jurisdictional element than FDIC insurance. Faced with the choice of following James or the more closely on point decisions in Warren, So-happy, and Gipe (among others), I have no difficulty concluding that the latter cases provide a sounder source of guidance.
IY
It follows that we should adopt here the same rule we apply in the Indian country and territorial jurisdiction cases, under which the court resolves the legal component of the jurisdictional element and submits the factual component to the jury. See, e.g., Jones, 480 F.2d at 1139 (“[T]he court’s instruction correctly left the factual element—the locus of the crime—to the jury, while reserving the question of law— whether the federal government had accepted jurisdiction—to itself.”). When a defendant’s status as an Indian under 18 U.S.C. § 1153 is contested at trial, the court should first determine, as a matter of law, that the defendant’s Indian tribe is federally recognized. (If the tribe is not federally recognized, of course, the court lacks subject matter jurisdiction. See Maggi, 598 F.3d at 1078; Heath, 509 F.2d at 19.) The court should then instruct the jury to decide, as a factual matter, whether the defendant has a blood connection and sufficient non-racial ties to that federally recognized tribe, as required by the two-prong test we established in Bruce, 394 F.3d at 1223-24.
The jury in this case did not receive such an instruction, and effectively received no instructions at all on the Indian status element. (The district court merely told the jury that in order to convict the jury had to find “the defendant is an Indian.”) This was error. But because Zepe-da did not object to the deficient instruction on Indian status, we review only for plain error, which requires (among other things) an error affecting Zepeda’s substantial rights. See Fed.R.Crim.P. 52(b); United States v. Olano, 507 U.S. 725, 731-32, 113 S.Ct. 1770, 123 L,Ed.2d 508 (1993). Under the plain error test, even when the court’s instructions omit an element of the offense altogether, reversal does not follow if uncontroverted evidence supporting the element was introduced at trial. United States v. Smith, 282 F.3d 758, 766-67 (9th Cir.2002).
No plain error occurred here. At trial, the government introduced uncontroverted evidence satisfying the factual component of the Indian status element: Zepeda’s certificate of tribal enrollment in the Gila River Indian Community. That certificate established: (1) that Zepeda has blood ancestry of “1/4 Tohono O’Odham” (thus satisfying the first prong of the Bruce test); and (2) that he was an enrolled member of the Gila River Indian Community (thus satisfying the second prong of the Bruce test). See, e.g., United States v. Torres, 733 F.2d 449, 455 (7th Cir.1984) (“[Ujncon-tradieted evidence of tribal enrollment and a degree of Indian blood constitutes adequate proof that one is an Indian for purposes of 18 U.S.C. § 1153.”); United States v. Dodge, 538 F.2d 770, 786-87 (8th Cir.1976)(enrollment and 1/4 Indian blood sufficient); United States v. Lossiah, 537 F.2d 1250, 1251 (4th Cir.1976)(enrollment and 3/4 Indian blood sufficient).
The district court did not determine whether the tribes at issue here are reeog- *1072 nized by the federal government. But they are, and they were so at the time of trial. The Tohono O’Odham Nation of Arizona and the Gila River Indian Community of the Gila River Indian Reservation, Arizona, both appear on the BIA’s list of federally recognized tribes. See Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 74 Fed.Reg. 40,218, 40,220, 40,221 (Aug. 11, 2009); see also Gila River Indian Cmty. v. United States, 697 F.3d 886, 889 (9th Cir.2012). Zepeda has not contested the federally recognized status of either tribe.
As the majority notes (Maj. Op. at 1065 n. 18), Zepeda does contest whether his “1/4 Tohono O’Odham” blood is from the Tohono O’Odham Nation of Arizona. That argument, however, has nothing to do with the issue that divides the panel. As I have explained, the court must decide as a legal matter whether a particular tribe has been federally recognized, but the jury still determines as a factual matter whether the defendant has a sufficient blood connection to that tribe to satisfy the first prong of the Bruce test. There is no sufficieney-of-the-evidence problem with respect to that factual issue here: Under Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), a rational jury could certainly infer that the reference in Zepe-da’s tribal enrollment certificate to “1/4 Tohono O’Odham” is a reference to the federally recognized Tohono O’Odham Nation of Arizona, particularly since Zepeda testified that he has lived his entire life in Arizona. Thus, even if the majority is correct to credit Zepeda’s argument—concocted for the first time after oral argument—that his “1/4 Tohono O’Odham” blood might be derived from Tohono O’Od-hams living in Mexico, the majority errs by granting Zepeda a judgment of acquittal rather than reversing and remanding for a new trial. See United States v. Affinito, 873 F.2d 1261, 1264-65 (9th Cir.1989).
But the majority is wrong to credit Zepeda’s argument in any event, because the Tohono O’Odham Nation of Arizona has historically encompassed, from the outset of federal recognition, members of the tribe residing in Mexico. “The recognition of the Nation by the federal government [in 1937] followed a census conducted on both sides of the border in which the United States affirmed the Nation’s definition of membership based on O’Odham blood. Members were included in a ‘base roll,’ a document that formed the basis of recognition for their Nation by the United States based on their blood, not on their country of citizenship, residency, or birth.” Courtney E. Ozer, Make It Right: The Case for Granting Tohono O’Odham Nation Members U.S. Citizenship, 16 Geo. Immigr. L.J. 705, 709 (2002) (footnote omitted).
The only question that remains is whether reversal is required because the district court failed to make the required legal ruling on the tribes’ federally recognized status. We dealt with a similar situation in United States v. Warren, 984 F.2d 325 (9th Cir.1993). There, the defendant was charged with a crime requiring commission of the offense within the special maritime and territorial jurisdiction of the United States. Id. at 327. The government alleged that the defendant committed the offense on an army base called Scho-field Barracks. The district court failed to determine, as a matter of law, that Scho-field Barracks was within the special territorial jurisdiction of the United States, and further failed to instruct the jury that it had to find, as a factual matter, that the crime was committed at Schofield Barracks. Id. We held that the district court’s wholesale failure to instruct the jury on the jurisdictional element was not plain error. As a factual matter, the government introduced uncontroverted evidence that the defendant committed the crime at *1073 Schofield Barracks. And, as a legal matter, we held that an army base is within the special territorial jurisdiction of the United States. Id. at 328.
Our decision in Warren confirms that the district court’s error in this case did not affect Zepeda’s substantial rights. Uncontroverted evidence established as a factual matter that Zepeda has a blood connection to one tribe and sufficient nonracial ties to another, satisfying both prongs of the Rrace test. And, as a matter of law, both tribes are federally recognized. That should be the beginning and end of our analysis here. I would affirm Zepeda’s convictions and therefore must respectfully dissent.