KOZINSKI, Circuit Judge,
with whom Circuit Judge IKUTA joins, concurring in the judgment:
The majority’s holding transforms the Indian Major Crimes Act into a creature previously unheard of in federal law: a criminal statute whose application turns on whether a defendant is of a particular race. Damien Zepeda will go to prison for over 90 years because he has “Indian blood,” while an identically situated tribe member with different racial characteristics would have had his indictment dismissed. It’s the most basic tenet of equal protection law that a statute which treats two identically situated individuals differently based solely on an unadorned racial characteristic must be subject to strict scrutiny. The racial test articulated in United States v. Bruce, 394 F.3d 1215 (9th Cir.2005), amounts to an unwarranted and impermissible “Indian exception” to that bedrock principle.
United States v. Maggi at least tethered Bruce’s racial component to a political relationship. 598 F.3d 1073, 1080-81 (9th Cir.2010). By overruling Maggi, the majority leaves the IMCA—and a host of other federal statutes governing tribes— shorn of even a colorable non-racial underpinning. I would instead affirm Zepeda’s conviction either by applying the IMCA to all members of federally recognized tribes irrespective of their race, or by holding, consistent with Maggi, that the jury had sufficient evidence to infer Zepeda’s ances *1117 try was from a federally recognized tribe. I concur in the judgment only.
1. The majority holds “that proof of Indian status ... requires only two things: (1) proof of some quantum of Indian blood, whether or not that blood derives from a member of a federally recognized tribe, and (2) proof of membership in, or affiliation with, a federally recognized tribe.” Maj. Op. at 1113. The first prong of that test is an overt racial classification. The majority is unconcerned by this because, in its view, “[t]he second prong of the Bruce test ... is enough to ensure that Indian status is not a racial classification, for the second prong requires, as a condition for the exercise of federal jurisdiction, that the defendant be a member of or be affiliated with a federally recognized tribe.” Maj. Op. at 1112.
But the presence of a separate and independent “nonracial prong” cannot save a test that otherwise turns on race. Bruce ⅛ political affiliation prong may provide a non-racial basis for limiting the IMCA only to tribe members. But not all tribe members are subject to the IMCA. Separating those who are from those who are not is the function of Bruce ’s first requirement, and that requirement turns entirely on race. That ineluctably treats identically situated individuals within a tribe differently from one another solely based on their immutable racial characteristics.
To claim that the Bruce test is “not a racial classification” because there’s a nonracial “condition for the exercise of federal jurisdiction” conflates Congress’s Article I power to enact a law with the affirmative restrictions imposed by the Fifth Amendment. The fact that the “defendant [is] a member of or [ ] affiliated with a federally recognized tribe” explains why Congress is able to criminalize a tribe member’s conduct, even absent a nexus to interstate activity. But the fact that Congress is permitted to create laws regulating tribe members doesn’t mean that Congress can administer those laws in a discriminatory fashion. That would be like saying a federal law extending criminal penalties only to those with “African blood” isn’t a racial classification because it can only be applied to people who engage in interstate commerce.
“[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny.” Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 224, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995). Indians are no exception. The Supreme Court has stressed time and again that federal regulation of Indian tribes does not equate to federal regulation of the Indian race. Federal laws governing tribes do “not derive from [ ] race ... but rather from [a tribe’s] quasi-sovereign status ... under federal law.” Fisher v. District Court, 424 U.S. 382, 390, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976) (per curiam). “[R]egu-lation is rooted in the unique status of Indians as [a nation] with their own political institutions ... [and] is not to be viewed as legislation of a ‘racial group consisting of Indians.’ ” United States v. Antelope, 430 U.S. 641, 646, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977) (quoting Morton v. Mancari, 417 U.S. 535, 553 n. 24, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). In fact, the Supreme Court has specifically stated that defendants are “not subjected to federal criminal jurisdiction [under the IMCA] because they are of the Indian race but because they are enrolled members of [a federally recognized] tribe.” Id. Taken together, Antelope and Mancari stand for the proposition that Congress can enact laws that treat members of federally recognized tribes differently from non-members so long as that disparate treatment occurs along political rather than racial lines. That holding cannot be reconciled *1118 with the holding here, which leaves Congress free to enact any law that racially discriminates between individuals within a tribe.
2. The panel in Bruce believed itself bound to apply a racial test because of the Supreme Court’s decision in United States v. Rogers, 45 U.S. (4 How.) 567, 11 L.Ed. 1105 (1846). Rogers is a nearly 170-year-old case, authored by Chief Justice Taney, in which the Court held that an adopted, non-racially Indian tribe member wasn’t subject to an exemption from federal criminal jurisdiction for crimes committed by an “Indian” against another “Indian.” Id. at 572-73. In defining “Indian” for purposes of the statute, the Court noted that the law “does not speak of members of a tribe, but of the race generally,—of the family of Indians,” id. at 573, and justified the federal government’s exercise of power over “this unfortunate race” in part based on the need “to enlighten their minds and increase their comforts, and to save them if possible from the consequences of their own vices,” id. at 572.
Reliance on pre-civil war precedent laden with dubious racial undertones seems an odd course for our circuit law to have followed, especially in light of the Supreme Court’s much more recent holdings in Mancari and Antelope. And, even if intervening developments in equal protection law hadn’t rendered Rogers obsolete, it’s clearly distinguishable. Rogers stands for the limited proposition that “a white man who at mature age is adopted in an Indian tribe does not thereby become an Indian,” 45 U.S. (4 How.) at 572, when the adoption occurs for the purpose of evading prosecution. A case that does no more than prohibit a tribe from making membership exceptions designed to circumvent criminal punishment is a weak reed upon which to rest the federal government’s unfettered ability to racially discriminate between tribe members.
The majority’s strongest support for Bruce ⅛ racial test appears to be an inference from the fact that the racial preference upheld in Mancari had a blood quantum requirement similar to the one at issue here. But that portion of the provision in Mancari wasn’t challenged by plaintiffs, nor was there any assertion that the hiring preference in that case discriminated among tribe members. Rather, the grievance in Mancari was that non-tribe members were discriminated against by the preferential hiring of tribe members. The constitutionality of that distinction was upheld because the preference was given to “tribal entities,” not to a “racial group.” I find it remarkable that the majority is able to read a case that upholds tribal preferences only so long as they are non-racial as a broad endorsement of the government’s power to racially distinguish between those within a tribe.
3. Overruling Maggi takes our circuit law in the wrong direction. Maggi at least tied the racial component in Bruce to a political relationship. Because Congress’s plenary power over Indian tribes is rooted in treaties and other political accommodations between sovereign entities, the validity of federal regulation must turn, not on a tribe’s existence in some anthropological sense, but on its political relationship with the United States. A genuine political relationship between sovereigns requires reciprocal recognition. Thus, as we correctly noted in LaPier v. McCormick, a political relationship between a tribe and the federal government exists only when “the United States recognizes [the] tribe.” 986 F.2d 303, 305 (9th Cir.1993). That’s why the Court in Man-can specifically noted Congress has the power “to legislate on behalf of federally recognized Indian tribes,” 417 U.S. at 551, 94 S.Ct. 2474 (emphasis added), not merely “tribes.”
*1119 Maggi ensured that we tied Bruce’s racial component to this political relationship. Regulation was rooted in a racial connection to an established political entity, rather than in an unadorned racial characteristic. Maggi was less than perfect, of course. At bottom, a racial distinction still controlled the application of federal law. But at least the racial lineage in question bore some relation to the purported source of federal power. An unrecognized tribe is not a quasi-sovereign political entity for the purposes of federal law, and has no political relationship whatsoever with the United States, To allow a federal statute to turn solely on a racial connection to an unrecognized tribe has no basis in the justification for disparate treatment articulated in Mancari and Antelope.
[[Image here]]
By extending Bruce and overruling Maggi, the majority creates a disturbing anomaly in the application of our equal protection law. The majority empowers Congress to distribute benefits and burdens within Indian tribes along purely racial lines. It may be that Congress will never use that power to work racial injustice, but the Constitution’s commands are inexorable precisely because we aren’t prescient enough to predict all the ways in which the government can abuse the power we give to it. Whatever complexities may be inherent in the federal regulation of Indian tribes, the equal protection clause permits no exceptions. Racial classifications must survive the strictest scrutiny. Those that cannot have no place in our law.