Opinion by Judge PAEZ; Dissent by Judge WATFORD.
OPINION
PAEZ, Circuit Judge:
On October 25, 2008, Damien Zepeda (“Zepeda”) traveled with his brothers Jeremy and Matthew Zepeda (“Matthew”) to the home of Dallas Peters (“Peters”), located on the Ak-Chin Reservation of Arizona. Zepeda and Matthew opened fire upon the house’s occupants, injuring Peters severely. In a nine-count indictment, the government charged Zepeda with, inter alia, conspiracy to commit assault, assault with a deadly weapon, and use of a firearm during a crime of violence.[1] The *1054 indictment alleged that Zepeda was an “Indianf ].” Following a jury trial, Zepeda was convicted of all counts.
The Major Crimes Act, 18 U.S.C. § 1153, provides for federal jurisdiction for certain crimes committed by Indians in Indian country.[2] The statute does not define who is an Indian, and determining the proper boundaries of federal jurisdiction over Indians is a formidable task. It is now well-settled in this circuit that we apply the two-part test articulated in United States v. Bruce, 394 F.3d 1215 (9th Cir.2005) to determine who is an Indian. We consider: (1) the defendant’s degree of Indian blood, and (2) the defendant’s tribal or government recognition as an Indian. Id. at 1223; United States v. Cruz, 554 F.3d 840, 845 (9th Cir.2009). More recently, we clarified that the first of these two prongs requires that the defendant’s “bloodline be derived from a federally recognized tribe.”[3] United States v. Maggi, 598 F.3d 1073, 1080 (9th Cir.2010).
This appeal calls upon us to decide whether a Certificate of Enrollment in an Indian tribe, entered into evidence through the parties’ stipulation, is sufficient evidence for a rational juror to find beyond a reasonable doubt that the defendant is an Indian for the purposes of § 1153 where the government offers no evidence that the defendant’s bloodline is derived from a federally recognized tribe. We hold that it is not.
I.
At Zepeda’s trial, the government introduced into evidence a document entitled “Gila River Enrollment/Census Office Certified Degree of Indian Blood.”[4] The document bore an “official seal” and stated that Zepeda was “an enrolled member of the Gila River Indian Community,” and that “information [wa]s taken from the official records and membership roll of the Gila River Indian Community.” It also stated that Zepeda had a “Blood Degree” of “1/4 Pima [and] 1/4 Tohono O’Odham” for a total of ⅛. The Certificate was signed by “Sheila Flores,” an “Enrollment Services Processor.” The prosecutor and Zepeda’s attorney stipulated to admission of the Certificate into evidence without objection.[5] Their stipulation stated: “The parties have conferred and have agreed that Exhibit 1[, the Tribal Enrollment Certificate,] ... may be presented at trial without objection and [its] contents are stipulated to as fact.”
The Tribal Enrollment Certificate was published to the jury through the testimony of Detective Sylvia Soliz, a detective for the Ak-Chin Police Department, who told the jury that she obtained the Certificate from the Gila River Indian Community in advance of trial, “confirming” that Zepeda was an enrolled member. The colloquy between Soliz and the prosecutor proceeded as follows:
Q: [Wje’ve talked a little bit about Native Americans and Indian blood and *1055 that sort of thing. Is this a jurisdictional requirement that you have? Explain that for the jury.
A: Yes, it is. I am only able to investigate if the witness would come to a federal status and the victim was an enrolled member of a tribe or—and if it occurred on the reservation boundaries.
[[Image here]]
Q: You talked about a certification of Indian blood. What is that?
A: It’s a piece of paper confirming through the tribe that you obtained from the enrollment office that confirms that this person is an enrolled member of their tribe and he[,] and they[,] do meet the blood quantum.
Q: And is that sometimes used in determining whether that person might be able to receive tribal benefits from the tribe?
A: Yes, it does.
Zepeda’s brother Matthew also testified regarding Zepeda’s Indian status. Matthew testified that he was half “Native American,” from the “Pima and Tiho” tribes, and that his Indian heritage came from his father. He also testified that he and Zepeda shared the same father, as well as the same mother, who was “Mexican.”
No further evidence regarding Zepeda’s Indian status was admitted. At the close of the government’s case in chief, Zepeda moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that insufficient evidence supported his convictions.[6] The court denied his motion. Zepeda renewed his motion at the close of the evidence, and again, his motion was denied.
On appeal, Zepeda argues, inter alia, that the government failed to prove beyond a reasonable doubt that he was an Indian under § 1153. We agree.
II.
Indian “tribes generally have exclusive jurisdiction over crimes committed by Indians against Indians in Indian country.” [7] United States v. LaBuff, 658 F.3d 873, 876 (9th Cir.2011). As we explained in United States v. Begay, 42 F.3d 486 (9th Cir.1994):
Indian tribes are recognized as quasi-sovereign entities that may regulate their own affairs except where Congress has modified or abrogated that power by treaty or statute. Courts have also recognized, however, that regulation of criminal activity in Indian country is one area where competing federal interests may override tribal interests.
Id. at 498.
To balance the sovereignty interest of Indian tribes and the United States’s interest in punishing offenses committed in Indian country, Congress enacted two statutes, 18 U.S.C. §§ 1152 and 1153. Id. Section 1152, the General Crimes Act,[8] grants federal jurisdiction over certain *1056 crimes committed by non-Indians against Indians in Indian country, but excludes crimes committed by one Indian against another. Id.; LaBuff 658 F.3d at 876. Section 1153, the Major Crimes Act,[9] creates federal jurisdiction for cases in which an Indian commits one of a list of thirteen enumerated crimes against another Indian in Indian country. Id. The government charged Zepeda and prosecuted him under the latter statute.
The question of Indian status operates as a jurisdictional element under § 1153. Cruz, 554 F.3d at 843; Bruce, 394 F.3d at 1228. Nonetheless, we have held that Indian status “is an element of the offense that must be alleged in the indictment and proved beyond a reasonable doubt.” Maggi, 598 F.3d at 1077 (citing Cruz, 554 F.3d at 845; Bruce, 394 F.3d at 1229). We have also held that whether a defendant is an Indian is a mixed question of fact and law that must be determined by the jury.[10] See Bruce, 394 F.3d at 1218, 1223, 1229; see also Maggi 598 F.3d at 1077; Cruz, 554 F.3d at 845. Indeed, it is the special province of the jury to resolve any factual disputes arising under the two prongs of the Bruce test. See Bruce, 394 F.3d at 1223; Maggi 598 F.3d at 1082-83; Cruz, 554 F.3d at 846-47.
“Although jurisdictional questions are ordinarily reviewed de novo, when a defendant brings a motion for acquittal in order to challenge the sufficiency of the evidence underlying a jurisdictional element, we owe deference to the jury’s ultimate factual finding.” Cruz, 554 F.3d at 843-44. “Accordingly ... we review the district court’s decision under the standard applied to sufficiency-of-the-evidence challenges: ‘whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.’ ” Id. at 844 (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)(emphasis omitted)); see also Unified States v. Nevils, 598 F.3d 1158, 1163-67 (9th Cir.2010)(en banc).
III.
A.
We first must determine whether the Tribal Enrollment Certificate was properly *1057 admitted into evidence, or rather, as Zepe-da urges, whether its admission violated his rights under the Confrontation Clause. Because Zepeda did not object at trial to the district court’s admission of the Certifí-cate pursuant to the parties’ stipulation, we review for plain error. United States v. Wright, 625 F.3d 583, 607 (9th Cir.2010).
“The test regarding the validity of a stipulation is voluntariness.” United States v. Molina, 596 F.3d 1166, 1168-69 (9th Cir.2010). We have previously held that “ ‘[stipulations freely and voluntarily entered into in criminal trials are as binding and enforceable as those entered into in civil actions.’ ” Id. at 1169 (quoting United States v. Technic Servs., 314 F.3d 1031, 1045 (9th Cir.2002) (alteration in original)). “ ‘[Stipulations serve both judicial economy and the convenience of the parties, [and] courts -will enforce them absent indications of involuntary or uninformed consent.’ ” Id. (quoting CDN Inc. v. Rapes, 197 F.3d 1256, 1258 (9th Cir.1999) (alterations in original)). “A ‘defendant who has stipulated to the admission of evidence cannot later complain about its admissibility’ unless he can show that the stipulation was involuntary.” Id. (quoting Technic Servs., 314 F.3d at 1045).
Zepeda points to no record evidence that he entered into the stipulation at issue involuntarily. Rather, he points to a lack of record evidence that his attorney informed him of the contents of the stipulation and its legal effect, and asserts that his counsel’s waiver of his Confrontation Clause rights was invalid. While his first contention is plausible, Soliz testified extensively regarding the Tribal Enrollment Certificate’s contents, referring both to Zepeda’s bloodline and to his eligibility for benefits from the Gila River Indian Community. This testimony at least put Zepe-da on notice regarding the contents of the stipulation. Regardless, Zepeda bears the burden on appeal of pointing to record evidence showing that his consent was involuntary, and he has not done so here. See Molina, 596 F.3d at 1169.
Moreover, our case law recognizes that “defense counsel may waive an accused’s constitutional rights as a part of trial strategy.” United States v. Gamba, 541 F.3d 895, 900 (9th Cir.2008). Counsel’s authority extends to waivers of the accused’s Sixth Amendment right to cross-examination and confrontation as a matter of trial tactics or strategy. Wilson v. Gray, 345 F.2d 282, 287-88 (9th Cir.), cert. denied, 382 U.S. 919, 86 S.Ct. 288, 15 L.Ed.2d 234 (1965).
Zepeda argues that waiver of a fundamental constitutional right cannot ever constitute a sound trial strategy, particularly where, as here, the Tribal Enrollment Certificate purported to establish an essential jurisdictional element. It appears from the record, however, that Zepeda’s attorney strategically focused Zepeda’s defense on the implausibility of government witnesses’ testimony, as compared to Zepeda’s markedly different version of the relevant events. He chose not to direct the jury’s attention to Zepeda’s Indian status, and informed the jury during his opening statement: “I will stipulate and concede things that ought to be conceded in terms of my client, Mr. Zepeda.” Although ultimately not a winning strategy, it was clearly “deliberately made as a matter of trial tactics,” and did not involve a “basic trial right[ ]” such as the decision “whether to plead guilty, waive a jury, testify in his ... own behalf, or take an appeal.” Gamba, 541 F.3d at 901 (quoting Florida v. Nixon, 543 U.S. 175, 187, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (internal quotation marks omitted)). Nor, as we discuss at length below, was the Tribal Enrollment Certificate sufficient to carry the government’s burden of proof of Zepe-da’s Indian status. Thus, Zepeda’s attor *1058 ney did not violate Zepeda’s Confrontation Clause rights when he stipulated to admission of the Certifícate. See Gamba, 541 F.3d at 900; Wilson, 345 F.2d at 287.
Accordingly, we conclude that the district court did not plainly err in admitting the Tribal Enrollment Certificate into evidence pursuant to the parties’ stipulation.
B.
Having determined that the Tribal Enrollment Certifícate was properly admitted into evidence, we turn to whether, viewing all evidence in the light most favorable to the government, any rational juror could have found beyond a reasonable doubt that Zepeda was an Indian, on the basis of the slim evidence as to both prongs of the Bruce test.
As noted, “[t]he Bruce test requires that the Government prove two things: that the defendant has a sufficient ‘degree of Indian blood,’ and has ‘tribal or federal government recognition as an Indian.’ ” Cruz, 554 F.3d at 845 (quoting Bruce, 394 F.3d at 1223, 1224). “The first prong requires ‘some’ Indian blood.” United States v. Ramirez, 537 F.3d 1075, 1082 (9th Cir.2008) (quoting Bruce, 394 F.3d at 1223). “Thus, ‘evidence of a parent, grandparent, or great-grandparent who is clearly identified as an Indian is generally sufficient to satisfy this prong.’ ” Id. (quoting Bruce, 394 F.3d at 1223).
“The second prong requires evidence that ‘the Native American has a sufficient non-racial link to a formerly sovereign people.’” Id. (quoting Bruce, 394 F.3d at 1224). “Courts analyzing this prong have considered evidence of: T) tribal enrollment; 2) government recognition formally and informally through receipt of assistance reserved only to Indians; 3) enjoyment of the benefits of tribal affiliation; and 4) social recognition as an Indian through residence on a reservation and participation in Indian social life.’” Id. (quoting Bruce, 394 F.3d at 1224). These four factors “are to be considered ‘in declining order of importance.’ ” Cruz, 554 F.3d at 846 n. 6 (quoting Bruce, 394 F.3d at 1224). “[Tjribal enrollment is ‘the common evidentiary means of establishing Indian status, but it is not the only means nor is it necessarily determinative’.... [Ejnrollment, and indeed, even eligibility therefor, is not dispositive of Indian status.” Id. (quoting Bruce, 394 F.3d at 1224-25 (some alterations in original)).
Our recent decision in United States v. Maggi made clear that “[tjhere is an important overlay to the Bruce test: To be considered an Indian under ...[§] 1153, the individual must have a sufficient connection to an Indian tribe that is recognized by the federal government. Affiliation with a tribe that does not have federal recognition does not suffice.” 598 F.3d at 1078 (emphasis in original).
In Maggi the court addressed the consolidated appeals of two defendants, Gor-dan Mann and Shane Maggi, both tried and convicted pursuant to § 1153. Mann was an enrolled member of the Little Shell Tribe of the Chippewa Cree, a tribe that was not recognized by the federal government, despite a longstanding petition for federal recognition. Id. at 1076. The court noted that tribal enrollment records often include identification of an individual’s percentage of Indian blood, and that this information is used to establish eligibility for enrollment. Id. Mann’s enrollment record reflected his degree of Indian blood as 10/64 Chippewa and 11/64 other Indian blood. Id. Maggi’s degree of Indian blood was 1/64 Blackfeet tribe, a tribe recognized by the federal government, and 1/32 Cree tribe. Id. at 1076, 1081-81. The record did not reflect whether Maggi was descended from a federally recognized group of the Cree tribe, such as the Rocky Boy Reservation Chippewa Cree, or a non- *1059 recognized group, such as the Little Shell Tribe Chippewa Cree. Id. Maggi was not an enrolled member of any tribe, though his mother’s enrollment in the Blackfeet tribe entitled him to the receipt of certain limited benefits. Id. at 1076-77. Both Mann and Maggi argued in the district court that they were not subject to prosecution under § 1153 because they were not Indians. Id.
The court in Maggi commented that we had previously addressed the issue of whether prosecution under § 1153 requires membership in a federally recognized tribe in LaPier v. McCormick, 986 F.2d 303, 304-06 (9th Cir.1993). In a federal habeas petition under 28 U.S.C. § 2254, LaPier challenged his Montana state court conviction, maintaining that he should have been tried for his alleged crime in federal court under § 1153 because he was an Indian. LaPier, like Mann, was a member of the Little Shell Tribe of Chippewa Cree. Id. at 306. The court reasoned that it did not need to examine whether LaPier had shown a sufficient degree of Indian blood or whether he had a sufficient connection to a tribe because he had failed to satisfy an antecedent requirement of affiliation with a federally recognized tribe:
We need not address ... the question whether LaPier has shown a significant degree of blood and sufficient connection to his tribe to be regarded as one of its members for criminal jurisdiction purposes. There is a simpler threshold question that must be answered first, and in this case it is dispositive: Is the Indian group with which LaPier claims affiliation a federally acknowledged Indian tribe? If the answer is no, the inquiry ends. A defendant whose only claim of membership or affiliation is with an Indian group that is not a federally acknowledged Indian tribe cannot be an Indian for criminal jurisdiction purposes.
Id. at 304-05 (internal quotation marks and citations omitted). The court therefore concluded that LaPier was not entitled to habeas relief.
Maggi recognized that LaPier ⅛ threshold requirement of affiliation with a federally recognized tribe stemmed from judicial and legislative acknowledgment that federal criminal jurisdiction over Indians is not dependent on a racial classification, but upon the federal government’s relationship with the Indian nations as separate sovereigns. 598 F.3d at 1078-79 (discussing LaPier, 986 F.2d at 305) (“Federal legislation treating Indians distinctively is rooted in the unique legal status of Indian tribes under federal law and upon the plenary power of Congress, based on a history of treaties and the assumption of a guardian-ward status, to legislate on behalf of federally recognized Indian tribes.”), United States v. Antelope, 430 U.S. 641, 646, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977) (“[Federal regulation of Indian affairs is not based upon impermissible classifications. Rather, such regulation is rooted in the unique status of Indians as ‘a separate people’ with their own political institutions .... [I]t is not to be viewed as legislation of a ‘racial’ group consisting of ‘Indians’ ....”) (quoting Morton v. Mancari, 417 U.S. 535, 553 n. 24, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), and Means v. Navajo Nation, 432 F.3d 924, 930 (9th Cir.2005)).
Accordingly, Maggi concluded that La-Pier’s requirement of affiliation with a federally recognized tribe was not altered or superseded by the test announced in Bruce, “which presupposes that ‘tribal or government recognition as an Indian’ means as an Indian from a federally recognized tribe.” Maggi, 598 F.3d at 1079 (quoting Bruce, 394 F.3d at 1223). It followed from this analysis that the first prong of the Bruce test requires “that the *1060 bloodline be derived from a federally recognized tribe.” Id. at 1080.[11]
C.
We must therefore determine whether the evidence the government presented at trial was sufficient, drawing all inferences in the government’s favor, to satisfy the threshold question identified in LaPier and Maggi namely, whether Zepe-da’s bloodline is derived from a federally recognized tribe. The Tribal Enrollment Certificate identifies Zepeda’s bloodline as 1/4 Pima and 1/4 Tohono O’Odham. The government introduced no evidence that either is a federally recognized tribe. Matthew’s testimony is equally unillumi-nating, since he described his ancestral bloodline as “Pima and Tiho.”
The government (and the dissent) argues that whether a given tribe is federally recognized is a question of law that should be determined by the court rather than the jury, and requests, at this late stage, that we take judicial notice of the fact that both the “Gila River Indian Community of the Gila River Indian Reservation, Arizona” and the “Tohono O’ Odham Nation of Arizona” are federally-recognized Indian tribes.[12] We address each issue in turn.
a.
fírme and its progeny make clear that Indian status is an element of any § 1153 offense, and as such, that it must be alleged in the indictment and proven beyond a reasonable doubt. 394 F.3d at 1229; Maggi, 598 F.3d at 1077; Cruz, 554 F.3d at 845. The government contends, nonetheless, that our case law has treated the fact of federal recognition as a purely legal question. We do not agree.
In LaPier, having determined that “[i]t is ... the existence of the special relationship between the federal government and the tribe in question that determines whether to subject the individual Indians affiliated with that tribe to exclusive federal jurisdiction for crimes committed in Indian country,” the court stated that, “[t]o determine whether that special relationship exists—whether the United States recognizes a particular tribe—we defer ‘to the political departments.’ ” 986 F.2d at 305 (quoting Baker v. Carr, 369 U.S. 186, 215, 82 S.Ct. 691, 7 L.Ed.2d 663 (^^additional citations omitted). The court indicated that such deference was owed to the Bureau of Indian Affairs, and commented that its list of federally recognized tribes published in the Federal Register pursuant to 25 C.F.R. pt. 83 “appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdiction inquiry.” Id. Consulting this list, the court determined that LaPier was not an Indian because the tribe with which he claimed affiliation was not among the listed tribes. Id. at 306 (“LaPier contends *1061 that he is an enrolled member of the Little Shell Band of Landless Chippewa Indians of Montana. Even if he is, that fact makes no difference because his claim to Indian status fails the threshold test. The Little Shell Band of Landless Chippewa Indians of Montana is not a federally acknowledged tribe of Indians. Thus, while LaPier may be an Indian in an anthropological or ethnohistorical sense, he is not an Indian for purposes of criminal jurisdiction.”) (citation and footnote omitted).
In United States v. Heath, 509 F.2d 16 (9th Cir.1974), the court considered the effect of the Klamath Termination Act, 25 U.S.C. § 564 et seq., on the defendant’s criminal conviction under § 1153, and found that federal criminal jurisdiction over the defendant was lacking because the Act terminated federal supervision over the Klamath Tribe. Id. at 19 (“The Klamath Termination Act ... was intended to end the special relationship that had historically existed between the Federal Government and the Klamath Tribe. While anthropologically a Klamath Indian even after the Termination Act obviously remains an Indian, his unique status vis-a-vis the Federal Government no longer exists .... We conclude accordingly that 18 U.S.C. § 1153 cannot serve to confer Federal jurisdiction with respect to crimes committed by terminated Klamath Indians.”).
Finally, in Maggi, discussed at length above, the court found that the threshold requirement of a bloodline from a federally recognized tribe was lacking for one defendant because there was an absence of evidence that his bloodline derived from a recognized tribe. 598 F.3d at 1080. This precedent, considered as a whole, reflects our recognition that there is a legal element embedded in the first prong of the Bruce test: Federal recognition is a legal status afforded to “American Indian groups indigenous to the continental United States ... that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present.” 25 C.F.R. § 83.3. The Bureau of Indian Affairs, in accordance with the governing regulations, affords the legal designation of federal recognition to those tribes that meet its criteria. See id. §§ 83.1-83.13 (noting procedures for establishing that an American Indian group exists as an Indian tribe). As we said in LaPier, “absent evidence of its incompleteness, the BIA list appears to be the best source to identify federally acknowledged Indian tribes whose members or affiliates satisfy the threshold criminal jurisdiction inquiry.” 986 F.2d at 305.
It does not follow, however, that federal recognition is self-evidencing. To the contrary, the question of whether a given tribe is indeed listed among the tribes recognized by the federal government remains quintessentially factual in nature. Our case law is clear that federal recognition, like all elements of Indian status, must be proved to the jury beyond a reasonable doubt. See Maggi 598 F.3d at 1077; Cruz, 554 F.3d at 845; Bruce, 394 F.3d at 1229; see also Ninth Cir. Model Jury Instr. No. 8.113 (“In order for the defendant to be found to be an Indian, the government must prove the following, beyond a reasonable doubt: First, the defendant has descendant status as an Indian, such as being a blood relative to a parent, grandparent, or great-grandparent who is clearly identified as an Indian from a federally recognized tribe.... ”)(emphasis added); id. cmt. (“The question of Indian status operates as a jurisdictional element under 18 U.S.C. § 1153. ‘Some blood’ evidence must be from a federally recognized tribe.”) (citations omitted). The government is not relieved of its evidentiary burden in a prosecution under § 1153 simply because federal recognition by the Bureau *1062 of Indian Affairs, at the end of the administrative process, is a legal designation.[13]
The government and dissent draw an analogy to territorial jurisdiction cases, and argue that the judge should determine the existence of federal recognition as a matter of law and so instruct the jury. Further, the government and dissent would have this court make such a finding where the prosecution failed to present evidence of federal recognition and the district court made no such finding. In United States v. Gipe, 672 F.2d 777 (9th Cir.1982) (per curiam), we explained that in “territorial jurisdiction cases, where the exercise of federal jurisdiction over a specific geographic area is necessary to vest jurisdiction in federal court ... the court may determine as a matter of law the existence of federal jurisdiction over the geographic area, [although] the locus of the offense within that area is an issue for the trier of fact.” Id. at 779. We also explained, however, that where the “locus of the act ... constitutes an element of the crime ... the prosecution should bear the burden of proof as to the status of the site” beyond a reasonable doubt. Id. As discussed at length supra, Indian status under § 1153 is an element of the offense. The government, therefore, must prove this element, like any other, by making a sufficient evidentiary showing that the tribe in question has achieved federal recognition. See Maggi, 598 F.3d at 1080.
In analogizing federal recognition to territorial jurisdiction, the dissent bases its disagreement, in part, on an “overriding practical consideration.” Dissent at 1067; see Dissent Part II. Although a practical consideration should not trump adherence to our case law, we nonetheless pause to address it. The dissent argues that, historically, determination of federal recognition of an Indian tribe “involved review of source materials that judges are better suited than juries to evaluate,” such as treaties, statutes and executive orders. Dissent at 1067. After reviewing this historical context, the dissent concludes, “[t]he fact that the source materials for resolving the issue of federal recognition have until recently been legal texts explains why there is no historical support for submitting that issue to the jury.” Dissent at 1068. The dissent is correct that until recently the determination of federal recognition may have involved some manner of source material interpretation. As we noted in LaPier, however, the process for determining federal recognition fundamentally changed in 1978; and the dissent fails to recognize that the entire body of case law regarding Indian status at issue here was developed against this modern legislative backdrop. As we noted above, in LaPier we looked to the BIA’s “comprehensive list” and found that “[a]bsent evidence of its incompleteness,” the list was the “best source” for determining federal recognition. 986 F.2d at 305. The dissent offers no evidence of incompleteness, nor is the dissent’s citation to other statutory provisions persuasive, as each congressional act is incorporated into the BIA’s list. See Dissent at 1068-69 (citing 25 U.S.C. §§ 566, 712a, 130% 1300b-ll). Thus, even this “practical” concern seems merely speculative.[14]
*1063 We draw support for our conclusion that the government failed to meet its burden of proof here from United States v. James, 987 F.2d 648 (9th Cir.1993). In that case, the defendant was convicted of bank robbery in violation of 18 U.S.C. § 2113(a). The government neglected to introduce evidence that the banks it accused the defendant of robbing were insured by the Federal Deposit Insurance Corporation (“FDIC”), though proof of FDIC insurance is an element of the charged offense. Id. at 649. At trial, the prosecutor alerted the district court that the parties were planning to enter into a stipulation that “ha[d] to do with the FDIC aspect of the case,” but no such stipulation was ever read to the jury. Id. We reversed and held that there was insufficient evidence to support the defendant’s conviction, reasoning that:
[T]here was no evidence before the jury at all on whether the banks were insured by the FDIC. The bank employees who testified did not testify as to the FDIC status of the banks, and the stipulation concerning the “FDIC aspect” of the case was not read to the jury or received into evidence. Without any evidence on the FDIC status of the bank, no rational jury could have found beyond a reasonable doubt that the banks were insured by the FDIC.
Id. at 650 (citation omitted).
Here, like in James, because the government presented no evidence to the jury that Zepeda’s bloodline derived from a federally recognized tribe, the jury lacked the requisite foundation to find beyond a reasonable doubt that the Pima or Tohono O’Odham tribes are federally recognized. Accordingly, we conclude that evidence of federal recognition sufficient to sustain Zepeda’s conviction on counts 2 through 9 of the indictment was lacking.[15]
*1064 We therefore turn to the government’s request that we take judicial notice of the Bureau of Indian Affairs’s list of federally recognized tribes in 2008 and 2010.
b.
The government is correct, as a general matter, that the Bureau of Indian Affairs’s list of federally recognized tribes is a proper subject of judicial notice, even on appeal. The fact of federal recognition is “capable of accurate and ready determination,” the Federal Register is a “source! ] whose accuracy cannot reasonably be questioned,” and a court may take judicial notice “at any stage of the proceeding.” Fed.R.Evid. 201(b)(2), (d); Papal v. Harbor Tug & Barge Co., 67 F.3d 203, 207 n. 5 (9th Cir.1995), rev’d on other grounds, 520 U.S. 548, 117 S.Ct. 1535, 137 L.Ed.2d 800 (1997) (“Rule 201 provides for judicial notice of adjudicative facts that are, inter alia, ‘capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.’ Such ‘[jjudicial notice may be taken at any stage of the proceeding,’ including on appeal....”) (citations omitted).
However, Rule 201 further provides that, “[i]n a criminal case, the court must instruct the jury that it may or may not accept the noticed fact as conclusive.” Fed.R.Evid. 201(f). In other words, judicially-noticed facts are insufficient to meet the government’s burden of proof beyond a reasonable doubt unless and until they are accepted by the jury as conclusive. Accordingly, we have recognized that, “[flor a court ... to take judicial notice of an adjudicative fact after a jury’s discharge in a criminal case would cast the court in the role of a fact-finder and violate defendant’s Sixth Amendment right to trial by jury.” United States v. Dior, 671 F.2d 351, 358 n. 11 (9th Cir.1982).[16] Indeed, “just because a fact may be generally known does not mean that the need to introduce evidence of that fact, or to request that it be judicially noticed, is dispensed with automatically. As Mr. Dooley once said: ‘Nuth’n walks itself into evidence.’ ” Id.
Here, although it would have been proper for the government to request the district court to take judicial notice of the fact of the Gila River Indian Community of the Gila River Indian Reservation, Arizona[17] *1065 and Tohono O’Odham Nation of Arizona tribes’ federal recognition as part of its case in chief, the government made no such request and the district court did not do so.[18] Rather, the jury found that Zepeda was an Indian pursuant to § 1153 in the absence of any proof that Zepeda’s bloodline derived from a federally recognized tribe. We are not at liberty to displace the role of the jury and to make this factual determination on its behalf. See James, 987 F.2d at 651 (rejecting the government’s argument that a rational juror could have found the defendant guilty of the federal crime of bank robbery beyond a reasonable doubt in light of the fact that “the district court could have taken judicial notice of the FDIC status of the bank” because “it was not asked to take judicial notice of the FDIC status of the bank and did not do so. Nor was any judicially noticed fact presented to the jury”).
Because “there is no evidence that [Zepeda] has any blood from a federally recognized Indian tribe,” Maggi, 598 F.3d at 1075, we conclude that no rational juror could have found Zepeda guilty beyond a reasonable doubt of counts 2 through 9 of the indictment, the offenses predicated on § 1153, and his convictions must be vacated.
IV.
In sum, we hold that the Tribal Enrollment Certificate was insufficient to establish that Zepeda is an Indian for the purposes of federal jurisdiction under § 1153 because the government introduced no evidence that Zepeda’s bloodline is derived from a federally recognized tribe. We do not suggest, in so holding, that a Tribal Enrollment Certificate may never be sufficient to meet the government’s burden under the first prong of the Bruce test. Of course, future cases may present circumstances in which the Certificate itself reflects this information. But that is not the case before us today.
Because we hold that the government introduced insufficient evidence under the first prong of the Bruce test, we need not consider whether the Tribal Enrollment Certificate alone was sufficient to carry the government’s burden as to the second *1066 prong. As to that issue, we express no opinion.
For the above reasons, Zepeda’s convictions under § 1153, in counts 2 through 9 of the indictment, are REVERSED. Zepeda’s conviction for conspiracy in violation of 18 U.S.C. § 371 is unaffected by this disposition.[19] See Begay, 42 F.3d at 499 (“Section 371 is a federal criminal statute of nationwide applicability, and therefore applies equally to everyone everywhere within the United States, including Indians in Indian country.”).
REVERSED in part and REMANDED for resentencing.

. The nine counts included: (1) conspiracy to commit assault with a dangerous weapon and assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153, 371, and 2; (2) assault resulting in serious bodily injury against Dallas Peters, in violation of 18 U.S.C. §§ 1153, 113(a)(6) and 2; (3) use of a firearm during a crime of violence as charged in count 2, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2; (4), (6), (8) assault with a dangerous weapon against Dallas Peters, Stephanie Aviles, and Jane Doe, in violation of 18 U.S.C. §§ 1153, 113(a)(3), and 2; *1054 and, (5), (7), (9) use of a firearm during the crimes of violence charged in counts 4, 6, and 8, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2. Aviles was Zepeda’s ex-girlfriend and Doe was Aviles’s cousin. Both were present at the Peters residence on the night of the shooting.

.Although we are mindful that the term “Native American” or “American Indian” may be preferable, we use the term “Indian” throughout this opinion since that is the term used in 18 U.S.C. § 1153 and at issue in this appeal.

. In this opinion, we consider the first prong only.

. For the purposes of clarity, we refer to this document as the "Tribal Enrollment Certificate” or “Certificate" throughout.

. The stipulation, which was signed by counsel, was admitted into evidence as Exhibit 48.

. We note that although Zepeda did not present argument to the district court regarding the sufficiency of the evidence of his Indian status, “Rule 29 motions for acquittal do not need to state the grounds upon which they are based because 'the very nature of such motions is to question the sufficiency of the evidence to support a conviction.’ ” United States v. Viayra, 365 F.3d 790, 793 (9th Cir.2004) (quoting United States v. Gjurashaj, 706 F.2d 395, 399 (2d Cir.1983)).

. "[T]he term 'Indian country’ ... means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government ... (b) all dependent Indi - an communities within the borders of the United States whether within the original or subsequently acquired territory thereof ... and (c) all Indian allotments, the Indian title*to which have not been extinguished, including rights-of-way running through the same.” 18 U.S.C. § 1151.

.Section 1152 provides that:
Except as otherwise expressly provided bt law, the general laws of the United States as to the punishment of offenses committed *1056 in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country.
This section shall not extend to offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively.
18 U.S.C. § 1152.

. Section 1153(a) provides:
Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, manslaughter, kidnaping, maiming, a felony under chapter 109A, incest, assault with intent to commit murder, assault with a dangerous weapon, assault resulting in serious bodily injury (as defined in section 1365 of this title), an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.
18 U.S.C. § 1153(a).

. As we explained in Bruce, "fmjixed questions of law and fact are those in which ‘the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard.’ ” 394 F.3d at 1218 (quoting Pullman-Standard v. Swint, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)).

. Applying this test, the court concluded that federal criminal jurisdiction was lacking over Mann because there was an "absence of evidence" before the jury that he had blood from a federally recognized tribe. Id. at 1080. His bloodline derived solely from a non-recognized tribe and "other" Indian blood, with no particular tribal affiliation. Id. Maggi, by contrast, had a bloodline of 1/64 Blackfeet tribe, a federally recognized tribe. The court declined to determine whether this quantum was sufficient to meet the requirement of "some blood,” but found the government's showing insufficient as to the four factors relevant to the second prong of the Bruce test. Id. at 1081-83.

. The names of both tribes, the government argues, appear in the Bureau of Indian Affairs lists of "Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs" published on April 4, 2008 and October 1, 2010. See 73 Fed. Reg. 18553 (April 4, 2008); 75 Fed.Reg, 60810 (Oct. 1,2010).

. We note that meeting the government’s burden of proof is hardly an onerous task. The government could, inter alia, present live testimony from a competent employee of the Bureau of Indian Affairs, request that the district court take judicial notice of the Bureau of Indian Affairs’s list of federally recognized tribes published in the Federal Register, or stipulate with defense counsel to the fact of a given tribe's federal recognition.

. The Tenth Circuit has taken a similar position with respect to the judicial role in determining federal recognition. "In 1978 the Department of Interior promulgated regulations establishing ‘procedures for establishing that an American Indian group exists as an Indian *1063 tribe.' ” W. Shoshone Bus. Council For & on Behalf of W. Shoshone Tribe of Duck Valley Reservation v. Babbitt, 1 F.3d 1052, 1056-57 (10th Cir.1993)(quoting 25 C.F.R. pt. 83). In analyzing whether a tribe was federally recognized, the Tenth Circuit reviewed, much like the dissent, the history of federal recognition and held that "the limited circumstances under which ad hoc judicial determinations of recognition were appropriate have been eclipsed by federal regulation." Id. at 1056 (referring to the express purpose of 25 C.F.R. § 83.2 to determine which tribes are federally recognized and holding that “the Tribe’s absence from this list is dispositive”).

. The government's reliance on United States v. Johnson, 680 F.3d 1140 (9th Cir.2012) is misplaced. In that case, the defendant was convicted of two counts of making a false statement on federal "Form 4473” respecting information required to be kept by a federally licensed firearms dealer, in violation of 18 U.S.C. § 924(a)(1)(A). Id. at 1142. The defendant argued on appeal that the district court erred by deciding as a matter of law, rather than submitting to the jury, the question of whether the "information required by law to be kept by federally licensed firearms dealers” included identification of the actual buyer on Form 4473. Id. at 1146. The court noted that "Title 18 U.S.C. § 922(b)(5) directs licensed dealers to maintain records containing 'the name, age, and place of residence’ of all individual buyers,” that "Title 18 U.S.C. § 923(g)(1)(A) states that licensed dealers must maintain 'such records of ... sale, or other disposition of firearms at his place of business for such period, and in such form, as the Attorney General may by regulations prescribe,’ " and that the Attorney General had promulgated regulations regarding the required contents of Form 4473. Id. at 1147. The court therefore concluded that "[t]he question whether the information on Form 4473 satisfied the requirements of § 924(a)(1)(A) was ... entirely a matter of law, which the district court correctly resolved.” Id. (citing United States v. Cabaccang, 332 F.3d 622, 624-25 (9th Cir.2003)(en banc) (“The construction or interpretation of a statute is a question of law. ... "((additional citation omitted)).
This case is readily distinguishable. The required contents of federal "Form 4473" is a question purely of statutory interpretation. By contrast, though the requirements of federal recognition are statutorily defined, the Bureau of Indian Affairs must make this determination in the first instance, subject to judicial review under the Administrative Pro *1064 cedure Act. See 25 C.F.R. §§ S3.1-83.13; Greene v. Babbitt, 64 F.3d 1266, 1271-75 (9th Cir.1995). Whether the Bureau of Indian Affairs has recognized a particular tribe is a factual question, and must, therefore, be proved to a jury.

. The court in Dior cited the Sixth Circuit's discussion of this point in United States v. Jones, 580 F.2d 219 (6th Cir.1978), with approval. In Jones, the Sixth Circuit addressed an appellate court's power under former Fed. R.Evid, 201(f) to take judicial notice “at any stage of the proceeding.” The court held that it could not take judicial notice on appeal of the fact that Southern Central Bell Telephone Company was a common carrier that provided facilities for the transmission of interstate or foreign communications. Id. at 224. The court noted that Rule 201 provides that the jury in a criminal case may, but is not required to, accept as conclusive any fact judicially noticed. Id. at 223. Therefore, the court reasoned, for an appellate court to take judicial notice of an adjudicative fact in a criminal case would frustrate the policies Congress sought to achieve in providing that a jury is not required to accept as conclusive a judicially noticed fact. Id. The Dior court agreed, adding that “[t]hese policies are to preserve the jury's traditional prerogative, in a criminal case, to ignore even uncontrovert-ed facts in reaching a verdict and to prevent the trial court from violating the spirit of the Sixth Amendment right to counsel by directing a partial verdict as to facts.” Dior, 671 F.2d at 358 n. 11 (citing Jones, 580 F.2d at 223-24; "Note of Committee of the Judiciary” H.R. No. 93-650, 93d Cong., 1st Sess. 6-7, reprinted in (1974) U.S.Code Cong. & Admin. News 7051, 7075, 7080). Dior remains good law and we are bound to follow its persuasive analysis.

. We note that because we are only concerned with the first prong of the Bruce test, the status of the Gila River is not actually relevant to our decision.

. The dissent would have this court find as a matter of law that the “Tohono O'Odham Nation of Arizona” and the "Gila River Indian Community of the Gila River Indian Reservation, Arizona” are federally recognized tribes. Dissent at 1072. Even were this court permitted to do so—which we are not— we would still be compelled to reverse Zepe-da's conviction on sufficiency grounds. Analyzing only the first prong of the Bruce test, there would remain no evidence in the record that the “Tohono O'Odham” referenced in Zepeda’s Tribal Enrollment Certificate refers to the federally recognized "Tohono O'Odham Nation of Arizona.” The dissent elides this point and claims that "Zepeda has not contested the federally recognized status” of the Gila River Indian Community nor the Tohono O’Odham Nation of Arizona. Dissent at 1072. To the point, Zepeda vigorously argues that the name “Tohono O'Odham” is not on the BIA list and that the "appellation ‘Tohono O’Odham' describes the collective Tohono O'Odham population, a substantial portion of which has always resided in the Sonoran Desert of northwest Mexico. The BIA specifically lists as federally recognized only the ‘Tohono O'Odham Nation of Arizona,' and not members of the collective ‘Tohono O’Odham’ tribe, ‘wherever residing’ that Zepeda’s certificate apparently describes.... [T]he Certificate’s recitation of ‘Tohono O’Odham’ must include the Tohono O’Odhams of Mexico, who cannot be the ‘Tohono O'Odham Nation of Arizona’
Even under the dissent’s law-fact dichotomy, the government still bore the burden of proving beyond a reasonable doubt the fact that Zepeda's blood derived from the federally recognized "Tohono O’Odham Nation of Arizona.” As Zepeda’s argument indicates, this is a factual inquiry and one that was not decided by the jury in this case—nor could it have been as it was never presented to the jury-

. Zepeda raises numerous additional issues on appeal that are relevant to his conspiracy conviction. We address those issues in a separate memorandum disposition filed concurrently with this opinion.